UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NICOLE RICHARDS,<br><br>    Plaintiff,<br><br> -against-<br><br>THOMAS C. KALLISH, EVERYONE'S EARTH, INC., and KANE SOCKS COMPANY.<br><br>    Defendants. | ECF Case # 7:22-cv-09095 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION
TO RESPONDENTS' MOTION FOR ATTORNEY-CLIENT PRIVILEGE**

Claudia Pollak, Esq.
75 S. Broadway, 4th Fl.
White Plains, NY 10706
(914) 529-9111
claudia@claudiapollaklaw.com

TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT…………………………………………………..1

II.   BACKGROUND FACTS…………………………………………………………2

    1.  Kallish's scheme to defraud Plaintiff……………………………………….2

    2.  Plaintiff lacked independent legal counsel………………………………….3

    3.  The patent counsel wrongly designated Kallish as co-inventor
        of Plaintiff's patents………………………………………………………...4

III.  ARGUMENT……………………………………………………………………...5

    1.  Relevant legal standards of patent law and inventorship…………………….5

    2.  Legal standard for attorney-client privilege………………………………..6

    3.  Defendants disclosed hundreds of communications concerning the same subject
        matter of the undisclosed communications, thereby waiving any purported
        attorney-client privilege……………………………………………………7

    4.  The attorney-client relationship is directly at issue in this action, resulting in a
        waiver of the attorney-client privilege……………………………………...8

    5.  Plaintiff had an implied attorney-client relationship with the patent counsel that
        created a joint engagement with Defendants, entitling Plaintiff to all Patent-related
        attorney communications…………………………………………………...8

            A.  *Legal standard for joint clients*……………………………………..8

            B.  *Plaintiff engaged in a confidential relationship with the patent counsel for
                the purpose of receiving advice on patenting her inventions*…………9

            C.  *As an unrepresented individual in a conflicting relationship with
                Everyone's Earth, the patent counsel failed to inform Plaintiff that they did
                not represent her, and to secure her own counsel, as required by law*...9

            D.  *Plaintiff executed the assignment agreements at issue in this action years
                after she began working with the patent counsel, and several months after
                the patent counsel filed the patent applications naming Everyone's Earth as
                applicant*………………………………………………………………11

i

E. *Engagement letters and payment of attorneys' fees are not dispositive of the existence of an attorney-client relationship*……………………………..13

6. Since the attorney-client privilege only shields confidential communications, Defendants waived any claimed privilege by disclosing the communications to Plaintiff and other third parties, in addition to lower-level employees………13

   A. *Legal standard for sharing confidential attorney communications*...………13

   B. *Defendants waived the attorney-client privilege when they intentionally sent patent counsel communications to Plaintiff*…………………………....14

   C. *Defendants waived the attorney-client privilege when they intentionally sent patent counsels' communications to third parties and lower-level staff*…15

7. Any claimed attorney-client privilege in this action is waived as a result of the crime-fraud exception……………………………………………………....17

   A. *Crime-Fraud Exception applicable law*………………………………….17

   B. *Probable cause exists*…………………………………………………….19

8. Defendants waived privilege for failure to adequately describe the communications……………………………………………………………...23

IV.   CONCLUSION…………………………………………………………….23

TABLE OF AUTHORITIES

TABLE OF CASES

*accord Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    319 F.R.D. 100, 104 (S.D.N.Y. 2017)……………………………………..6

*accord In re Bairnco Corp. Secs. Litig.*,
    148 F.R.D. 91, 96 (S.D.N.Y. 1993)………………………………………..7

*Advance Video Techs., LLC v. HTC Corp.*,
    103 F. Supp. 3d 409 (S.D.N.Y. 2015)……………………………………11

*Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*
    LEXIS 100080, WL 5231831 (E.D.N.Y. 2008)………………………….17

*Antidote Int'l Films, Inc. v. Bloomsbury Publ'g, PLC*,
    242 F.R.D. 248, 250-51 (S.D.N.Y. 2007)………………………………...18

*Application of Sarrio, S.A.*,
    119 F.3d 143, 147 (2d Cir. 1997)………………………………………….7

*A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*,
    WL 61442 at *5 (S.D.N.Y. 1999)…………………………………………18

*Bass Pub. Ltd. Co. v. Promus Cos.*,
    868 F. Supp. 615 (SDNY 1994)……………………………………………8

*Beech Aircraft Corp. v. EDO Corp.*,
    990 F.2d 1237, 1248 (Fed. Cir. 1993)………………………………..6,10

*BBAM Aircraft Mgmt. LP v. Babcock & Brown LLC*,
    LEXIS 154791, WL 3716574 (D. Conn. 2022)……………………………7

*Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*,
    171 F. Supp. 3d 136, 140 (S.D.N.Y. 2016)………………………………..6

*Cendant Corp. v. Shelton*,
    246 F.R.D. 401, 405 (D. Conn. 2007)……………………………………18

*Chevron Corp. v. Salazar*,
    275 F.R.D. 437, 451-52 (S.D.N.Y. 2011)………………………………...18

*Diversified Group, Inc. v. Daugerdas*,
    139 F. Supp. 2d 445 (S.D.N.Y. 2001)…………………………………….9

*Eli Lilly & Co. v. Aradigm Corp.*,
   376 F. 3d 1352 (Fed. Cir. 2004)……………………………………………..6

*Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co,*
   232 F.R.D. 103, 113 (S.D.N.Y. 2005)…………………………………14, 17

*Fullerton v. Prudential Ins. Co.*,
   194 F.R.D. 100, 102 (S.D.N.Y. 2000)…………………………………….14

*First NBC Bank v. Murex, LLC*,
   259 F. Supp. 3d 38 (S.D.N.Y. 2017)…………………………………….9

*Hayhurst v. Rosen*,
   LEXIS 7312, WL 123178 (E.D.N.Y. 1992)……………………………..5

*In re Allergan PLC Secs. Litig.*,
   LEXIS 171331, WL 4121300 (S.D.N.Y. 2021)………………………….15

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*,
   731 F.2d 1032, 1039 (2d Cir. 1984)……………………………………18

*In re John Doe, Inc.*,
   13 F.3d 633, 636 (2d Cir. 1994))………………………………………5, 17

*In re Richard Roe, Inc.*,
   168 F.3d 69, 71-72 (2d Cir. 1999)……………………………………..17

*In re Kidder Peabody Secs. Litig.*,
   168 F.R.D. 459 (SDNY 1996)…………………………………………..8

*Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*,
   973 F. 2d 911, 916-917 (Fed. Cir. 1992)……………………………..6

*Kingsway Fin. Servs. V. Pricewaterhouse-Coopers LLP*,
   LEXIS 69117, WL 4200601 (SDNY 2008)…………………………….7

*Maricultura del Norte v. Worldbusiness Capital, Inc.*,
   LEXIS 29953, 2015-1 Trade Cas. (CCH) (S.D.N.Y. 2015)………………13

*McCutcheon v. Colgate-Palmolive Co.*,
   2018 WL 5818255, at *3 (S.D.N.Y. 2018)……………………………..15

*Merck Eprova AG v. ProThera, Inc.*,
   670 F. Supp. 2d 201, LEXIS 126632 (SDNY 2009)………………………9

*Monterey Bay Military House., LLC v. Ambac Assur. Corp.*,
LEXIS 9646, WL 315072 (S.D.N.Y. 2023)……………………………...14

*Music Sales Corp. v. Morris*,
WL 974025, *7-8 (S.D.N.Y. 1999)………………………………………..16

*Permian Corp. v. United States*,
665 F.2d 1214, 1221 (D.C. Cir. 1981)………………………………….....7

*Pritchard v. County of Erie*,
546 F.3d 222 (2d Cir. 2008)…………………………………………………8

*SEC v. Herman*,
WL 964104, at *2 (S.D.N.Y. 2004)………………………………………..18

*Secured Worldwide, LLC v. Kinney*,
LEXIS 192841 (S.D.N.Y. 2016)…………………………………………….6

*Separation Design Group LLP Holdings v. Inogen, Inc.*,
LEXIS 234889 (S.D.N.Y. 2017)…………………………………………..12

*Sewall v. Walters*,
21 F. 3d 411, 415 (Fed. Cir. 1994)…………………………………………19

*Shahinian v. Tankian*,
242 F.R.D. 255, 259 (S.D.N.Y. 2007)……………………………………19

*Specialty Minerals, Inc. v. Pleuss-Stauffer AG*,
WL 42280, at *10-11 (S.D.N.Y. 2004)…………………………………..19

*Speedfit LLC v. Woodway USA, Inc.*,
LEXIS 55187 (E.D.N.Y. 2019)…………………………………………..12

*United States v. Jacobs*,
117 F.3d 82, 87 (2d Cir. 1997)………………………………………5, 17

*United States v. McDonald*,
WL 31956106, at *5 (E.D.N.Y. 2002)……………………………………19

*United States v. Mejia*,
655 F.3d 126, 132 (2d Cir. 2011)……………………………………13, 14

*United States v. Saccoccia*,
898 F. Supp. 53, 57 (D.R.I. 1995)…………………………………….18

*United States v. Schwimmer*,
        892 F.2d 237 (2d Cir. 1989)……………………………………...…13

*U.S. v. Spinosa*,
        LEXIS 120141, WL 2644936 (S.D.N.Y. 2021)………………………...17

U*nited States v. Zolin*,
        491 U.S. 554, 563 (1989)……………………………………………….17

*Univ. of W. Va. V. Van Voorhies*,
        278 F.3d 1288 (Fed. Cir. 2002)……………………………………………11

*von Bulow v. von Bulow*,
        811 F.2d 136, 141 (2d Cir. 1987)………………………………………..6

*Wultz v. Bank of China Ltd.*,
        304 F.R.D. 384, 391 (S.D.N.Y. 2015)………………………………..7


## STATUTES, RULES

35 U.S.C. § 102(f)……………………………………………………………6

35 U.S.C. § 261..11………………………………………………………….11

F.R.E. 502……………………………………………………………………7

§ 11.113(f) of the USPTO Rules of Professional Conduct……………………10

Rule 4.3 of the New York Rules of Professional Responsibility…………..10, 11

**PRELIMINARY STATEMENT**

Plaintiff Nicole Richards objects to Defendants' assertion of privilege of 3,055 documents involving the former patent counsel[1] of Defendants Thomas Kallish ("Kallish") and Everyone's Earth, Inc.[2] ("Everyone's Earth") in relation to Kallish's claimed inventorship of the two patents in suit (the "Patents") and their purported assignment by Plaintiff to Everyone's Earth. Plaintiff refutes Kallish's claims of co-inventorship of the Patents, alleging that he engaged in inequitable conduct by knowingly making false declarations to the United States Patent and Trademark Office ("USPTO"), under penalty of perjury, of his joint inventorship of the Patents when he contributed nothing to their development, as required to be designated a joint inventor under 355 U.S.C. § 116.

Despite engaging with Defendants' counsel in numerous meet and confers and email communications over several months, Defendants continue to withhold thousands of documents without satisfying their burden of demonstrating that the communications are entitled to the attorney-client privilege. Defendants even claim privilege over several hundred documents that are already in Plaintiff's possession which were sent directly by her to the patent attorneys and vice versa. While Plaintiff has a right to discovery of these communications, Kallish has refused to respond to Requests for Admission (and will presumedly refuse to respond to deposition questions) about these and numerous other documents based on the attorney-client privilege. Accordingly, pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure, Plaintiff moves to compel the production of the documents improperly withheld by Defendants based on the attorney-client privilege, and to be permitted to depose the patent counsel about their content and

---

[1] "Patent counsel" includes four attorneys from three separate law firms identified on Defendants' privilege log who were associated with the prosecution of various patents for inventions by Plaintiff, including the Patents.

[2] While Defendants argue (Def. Mem. p. 1) the attorney-client privilege applies to their "predecessor company Tommie for Mommie, Inc.," Defendants have provided no explanation nor any evidence of its association to Everyone's Earth to warrant any consideration in the instant matter.

1

any patents invented by Plaintiff that were prosecuted by the patent counsel, based on Defendants' overbroad assertions of the attorney-client privilege, and resulting from the crime-fraud exception.

## **BACKGROUND FACTS**

### *Kallish's scheme to defraud Plaintiff*

In or around May of 2015, Defendant Kallish proposed to Plaintiff, an experienced chemist and inventor, that she develop a disposable biodegradable diaper made primarily from cotton rather than plastic, and that they would be stockholders of a corporation that Kallish would incorporate in order to exploit the proposed eco-friendly diaper to be invented by Plaintiff. Plaintiff, who lacked any business acumen or knowledge of patent law, trusted and relied upon the business and legal advice of Kallish, a purported successful businessman, to promote and organize the new company for their mutual benefit. Kallish formed Defendant Everyone's Earth and falsely informed Plaintiff that she was "the second largest shareholder" of the company, though the company had not granted her any stock.

Plaintiff spent several years developing the diaper without any compensation from Defendants or any other parties, while also working regularly with the patent counsel to patent her inventions. Though Kallish had contributed nothing to the conception or development of the Patents, the patent counsel erroneously designated him as co-inventor on the patent applications. BATES 27304-27355, 32270-32272. This, Kallish indicated in substance, had the legal effect of automatically granting him undivided rights in the Patents that allowed him to exploit them without sharing the profits with Plaintiff. As a result, as Plaintiff alleges in her Amended Complaint, Plaintiff was induced into assigning her interests in the Patents to Everyone's Earth. Thus, while Kallish took on the role of senior officer and majority stockholder of Everyone's Earth, Plaintiff received nothing. Years after the assignment of her inventions to Everyone's Earth, she was

granted an option to purchase a miniscule portion of the company's stock, with the stock subject to forfeiture if she refused to work for Defendants without compensation—a deal that greatly different from the substantial grant of "founder's shares" that Kallish had promised to provide Plaintiff without cost.

### *Plaintiff lacked independent legal counsel*

Plaintiff was never represented by independent legal counsel throughout the several years of drafting, filing and prosecuting the Patents, nor in connection with the purported assignment of her rights in the Patents and provisional patents (which do not include all of the claims in the final Patents) to Everyone's Earth. However, throughout the entire period that Plaintiff worked collaboratively on the prosecution of the Patents with the patent counsel, they never informed her that they were solely representing Everyone's Earth and not her as inventor. In addition, the patent counsel failed to inform Plaintiff that, as an unrepresented individual, she should secure her own independent counsel—despite that the assignments of the provisional patents and the Patents created a clear divergence of the parties' interests that resulted in a material conflict of interest which impacted the patent attorneys' rights to continue to communicate with Plaintiff.

Indeed, the patent counsel lacked any justification for their actions in failing to advise her that they did not represent her and that she should secure her own legal counsel: Plaintiff was never a paid or *de facto* employee of Everyone's Earth, nor its consultant or independent contractor, nor had she entered into an agency relationship with Defendants (who lack any written agreement by Plaintiff to act as Everyone's Earth's agent), as they claim. Nevertheless, the patent counsel, whom Plaintiff believed to be acting as her counsel in her capacity as inventor, engaged in hundreds of communications with Plaintiff over several years, yet instructed her to take actions that were adverse to her interests in assigning her rights in her inventions for no consideration. As a result

3

of the trust that Plaintiff placed in the patent counsel because of their long-standing confidential relationship, Plaintiff affirms that, had the patent counsel simply advised her to secure her own legal counsel, she would have done so. Ex. A, Pla. Aff. p. 2.

*The patent counsel wrongly designated Kallish as co-inventor of Plaintiff's patents*

The patent counsel wrongly added Kallish as a joint inventor on Plaintiff's patent applications, despite that they lacked any evidence that Kallish contributed to the technical design or any of the claims comprising the Patents. To the contrary, several red flags arose throughout the patent counsels' representation of Kallish in relation to his claimed inventorship of several patents invented solely by Plaintiff. Indeed, Defendants make an admission (Def. Mem. p. 7) "that patent counsel corresponded principally with Mr. Kallish…concerning the business aspects of the engagement," while Plaintiff's role—and not Kallish's—was characterized by Defendants as "a key inventor of the intellectual property for which the patents were pursued" because "Ms. Richard's unique knowledge and understanding of the technology underlying the patents was indispensable to the attorneys' ability to draft and amend the patent applications as well as respond to requests and notices from the USPTO as a key inventor." However, Defendants do not explain why only one of the inventors, Plaintiff, is "indispensable" to the prosecution of the Patents, and not Kallish, if he was indeed a co-inventor.

While Defendants blame Plaintiff for her alleged failure to understand the eligibility requirements of inventorship, she reasonably trusted in the professional skill and judgment of the patent counsel's designation of Kallish as co-inventor of the Patents. Kallish had convinced Plaintiff that, because he asserted that he had the idea for the inventions and was providing development resources, he was justified in including himself as joint inventor of the Patents. In

hindsight, lacking a legal representative, Plaintiff appears to have conflated the rights and requirements of a patent applicant with those of inventorship.

## ARGUMENT

With respect to Defendants' assertions of attorney-client privilege, Plaintiff argues (1) that Defendants waived any privilege as to the communications referenced in Defendants' privilege log by failing to adequately describe the communications on its initial privilege log, nor on its updated privilege log following the Court's order to amend the log; (2) that many of the communications are not protected attorney legal advice or attorney work-product; (3) that Plaintiff was a joint client of the patent attorneys, and directly sent and received hundreds of the claimed privileged communications, and therefore has a right to disclosure of all communications related to the Patents, including those solely between Defendants' and the patent counsel; and (4) that any purported attorney-client privilege was waived when the documents were voluntarily disclosed to third-parties and/or employees that did not have a need to act on the patent attorneys' legal advice.

Alternatively, if the Court determines that the communications set forth on Defendants' privilege log are not waived as Plaintiff argues, the communications with patent counsel are nevertheless not privileged under the crime-fraud exception, which "removes the privilege from those attorney-client communications that are 'relate[d] to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997) (alteration in original) (quoting *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994)).

### 1.  Relevant legal standards of patent law and inventorship.

A person is not entitled to apply for a patent if "he did not himself invent the subject matter sought to be patented." *Hayhurst v. Rosen*, LEXIS 7312, WL 123178 (E.D.N.Y. 1992). 35 U.S.C.

5

§ 102(f). "Individuals cannot be totally independent of each other and be joint inventors." *Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F. 2d 911, 916-917 (Fed. Cir. 1992).

Ownership of a patent or patent application "initially vests in the named inventors of the invention of the patent," who are considered the owners unless and until they transfer their property interest. *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993)). See also 37 C.F.R. § 3.73(a). "[I[n the context of joint inventorship, each co-inventor presumptively owns an undivided interest in the entire patent, no matter what their respective contributions." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F. 3d 1352 (Fed. Cir. 2004). Accordingly, "[e]ach co-owner of a United States patent is ordinarily free to make, use, offer to sell, and sell the patented invention without regard to the wishes of any other co-owner…[including the right] to license others, a right that also does not require the consent of any other co-owner…" *Secured Worldwide, LLC v. Kinney*, LEXIS 192841 (S.D.N.Y. 2016).

## 2. Legal standard for attorney-client privilege.

Where, as here, evidence is "relevant to both the federal and state claims[,] . . . privileges are governed by the principles of federal law." *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987); *accord Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 319 F.R.D. 100, 104 (S.D.N.Y. 2017). Under federal common law, "[t]he attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011); *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*, 171 F. Supp. 3d 136, 140 (S.D.N.Y. 2016). However, courts in this district have emphasized that "[w]hile the privilege confers important social benefits, it also exacts significant costs" because "[i]t runs counter to the ordinary judicial interest in the disclosure of all relevant

6

evidence." *Application of Sarrio, S.A.*, 119 F.3d 143, 147 (2d Cir. 1997); *accord In re Bairnco Corp. Secs. Litig.*, 148 F.R.D. 91, 96 (S.D.N.Y. 1993) (noting that "the attorney-client privilege both advances and impedes the administration of justice"). As a result, courts "apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." *Id. Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C. Cir. 1981). *Mejia*, 655 F.3d at 132.

"It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship, . . . a burden not discharged by mere conclusory or *ipse dixit* assertions." *Kingsway Fin. Servs. V. Pricewaterhouse-Coopers LLP*, LEXIS 69117, WL 4200601 (SDNY 2008). *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 391 (S.D.N.Y. 2015)) However, Defendants have failed to meet their burden of proof to establish their entitlement to the attorney-client privilege in connection with the discovery of information related to the inventorship of the Patents, their prosecution with the USPTO, and their assignment to Everyone's Earth.

> **3. Defendants disclosed hundreds of communications concerning the same subject matter of the undisclosed communications, thereby waiving any purported attorney-client privilege.**

"[U]nder Rule 502 of the Federal Rules of Evidence, the attorney-client privilege is waived as to undisclosed communications" if "(1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." *BBAM Aircraft Mgmt. LP v. Babcock & Brown LLC*, LEXIS 154791, WL 3716574 (D. Conn. 2022). Here, Kallish and the patent counsel intentionally disclosed numerous emails about the Patents to Plaintiff. Defendants' voluntary disclosure to Plaintiff of hundreds of attorney-client emails related to the Patents, "resulting in a privilege waiver

7

of all additional attorney-client communications concerning the same subject matter." "[F]airness dictates that Plaintiff be granted access to additional emails related to the subject matter." *Id*.

### 4. The attorney-client relationship is directly at issue in this action, resulting in a waiver of the attorney-client privilege.

An "[i]mplied waiver of protection for a privileged communication may be found when a client places the attorney-client relationship directly at issue…[or]…when a client asserts reliance on an attorney's advice as an element of a claim or defense..." *Pritchard v. County of Erie*, 546 F.3d 222 (2d Cir. 2008). *In re Kidder Peabody Secs. Litig.*, 168 F.R.D. 459 (SDNY 1996). Here, Mr. Kallish's relationship with the patent counsel is directly at issue in this matter, and only the patent counsel can explain the evidence they held to make the determination to name Kallish as a co-inventor of the Patents. In fact, there are several questionable actions involving the patent counsel that can only be explained by them. For example, while the patent counsel had filed the patent application for the '806 patent naming only Plaintiff as an inventor, approximately three months later the patent counsel filed an amended patent application with the USPTO, with the only change being the addition of Kallish as an inventor while the claims and other technical and design information underlying the patent remained the same. This begs the question as to what documentation or information caused the patent counsel to add Kallish as co-inventor.

### 5. Plaintiff had an implied attorney-client relationship with the patent counsel that created a joint engagement with Defendants, entitling Plaintiff to all Patent-related attorney communications.

#### A. *Legal standard for joint clients.*

Plaintiff and Defendants were joint clients in connection with the prosecution of the patents, and the attorney-client privilege is waived as between jointly-represented clients. *Bass Pub. Ltd. Co. v. Promus Cos.*, 868 F. Supp. 615 (SDNY 1994). "To establish a fiduciary or implied attorney-client relationship, the putative client must show that he submitted confidential

information to a lawyer with the reasonable belief that the lawyer was acting as his attorney." *Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445 (SDNY 2001). "The operative test…does not turn on the lawyer's state of mind or good faith or intentions. It is focused on the reasonableness of the *client*'s belief that there was an attorney-client relationship, including based on the services performed." *First NBC Bank v. Murex, LLC*, 259 F. Supp. 3d 38 (S.D.N.Y. 2017).

"Courts have long recognized the existence of the attorney-client relationship among clients and attorneys allied in a common legal cause..[and] [t]ypically, parties jointly developing a patent with an attorney commonly have a 'common legal interest' in obtaining the greatest protection and in exploiting the patents." *Merck Eprova AG v. ProThera, Inc*., 670 F. Supp. 2d 201, LEXIS 126632 (SDNY 2009). Therefore, where, as here, "two parties are jointly prosecuting a patent application, they are commonly considered to be joint clients." *Id*.

### B. Plaintiff engaged in a confidential relationship with the patent counsel for the purpose of receiving advice on patenting her inventions.

Here, Plaintiff submitted confidential information about her inventions to the patent attorneys in connection with the patenting of her inventions, including engaging in hundreds of communications with the patent counsel regarding both the prosecution of the Patents as well as unrelated patents, signing several Powers of Attorney in favor of the patent attorneys, and being personally represented, in her capacity as the inventor of the Patents in two USPTO examiner meetings without Defendants' involvement.

### C. As an unrepresented individual in a conflicting relationship with Everyone's Earth, the patent counsel failed to inform Plaintiff that they did not represent her, and to secure her own counsel, as required by law.

Plaintiff's lack of independent legal counsel, and the patent counsels' utter failure to inform her that they did not represent her, lends credence to Plaintiff's assertions that she reasonably believed that she was jointly represented by the patent counsel. Once it became clear that the

9

parties' interests were divergent (in assigning Plaintiff's inventions to Everyone's Earth), the patent counsel were obligated under § 11.113(f) of the USPTO Rules of Professional Conduct[3] to directly inform Plaintiff that they only represented Everyone's Earth, which they did not. Moreover, under Rule 4.3 of the Rules of Professional Responsibility,[4] the patent counsel were required to cease further communications with Plaintiff, other than to clarify that they did not represent her and to advise her to secure her own legal counsel.

Instead, the patent counsel wrongly added Kallish as a co-inventor of the Patents without any basis, directed Plaintiff to execute assignments of her Patents in favor of Everyone's Earth, and proceeded to file the patent applications with the USPTO naming Everyone's Earth as applicant before Plaintiff executed the assignment agreements at issue in this action—though this right is vested solely in the inventors unless and until they assign their rights. *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993). The patent counsels' engaging in hundreds of direct communications with Plaintiff over several years, including instructing her to execute documents falsely naming Kallish as co-inventor of her patents and assignments of her provisional patents and the patents in suit (which reference different claims), without ever informing her that they did not represent her, lead to confusion on Plaintiff's part as to her relationship with them. Indeed, Plaintiff trusted their advice and would have sought her own legal counsel if she had been

---

[3] The USPTO Rules of Professional Conduct, § 11.113(f) provides that In dealing with an organization's directors, officers, employees, members, shareholders, or other constituents, a practitioner shall explain the identity of the client when the practitioner knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the practitioner is dealing.

[4] Rule 4.3 of the NY Rules of Professional Conduct requires that: "[i]n communicating on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give legal advice to an unrepresented person other than the advice to secure counsel if the lawyer knows or reasonably should know that the interests of such person are or have a reasonable possibility of being in conflict with the interests of the client."

so advised by the patent counsel, as they were obligated under Rule 4.3 of the New York Rules of Professional Responsibility. Ex. A, Pla. Aff. p. 2.

### D. Plaintiff executed the assignment agreements at issue in this action years *after* she began working with the patent counsel, and several months *after* the patent counsel filed the patent applications naming Everyone's Earth as applicant.

Defendants erroneously argue (Def. Mem. p. 2) that

"it was always the understanding between Mr. Kallish and Ms. Richards that any interest in the patents developed in connection with a biodegradable diaper product would belong to the Companies, and it was not until the filing of the instant lawsuit that Ms. Richards claimed ignorance of this incontrovertible fact."

Plaintiff's rights in her patents could not have automatically transferred to Everyone's Earth without any documentary evidence, pursuant to a mere "understanding" of Kallish's. To the contrary, both New York's statute of frauds and the Federal Patent Act require that "[a]ll assignments of interests in a patent…must be in writing" to be effective (*Advance Video Techs., LLC v. HTC Corp.*, 103 F. Supp. 3d 409 (S.D.N.Y. 2015), 35 U.S.C. § 261. Thus, while an "assignee may choose its counsel for prosecution of the applications that it owns" (*Univ. of W. Va. V. Van Voorhies*, 278 F.3d 1288 (Fed. Cir. 2002), Plaintiff had not even executed the assignments until months after the applications for the Patents were filed with the USPTO. As a result, Everyone's Earth lacked the right to be designated by the patent counsel as applicant of the Patents,[5] and there was no nexus between Plaintiff's inventions and Everyone's Earth until she executed the assignment agreements at issue in this matter years into the representation by the patent counsel.

---

[5] The patent counsel filed three provisional patents with the USPTO related to the diaper product which each named Plaintiff as sole inventor and applicant, at the same time filing three corresponding assignments in favor of Everyone's Earth. Several years later, the patent counsel filed applications with the USPTO for the Patents (the patents in suit), with different and additional claims that were not referenced in the provisional patents, naming Kallish and Plaintiff as co-inventors and Everyone's Earth as applicant. The two corresponding assignments for the two patents in suit in favor of Everyone's Earth were executed by Plaintiff after the patent counsel filed the patent applications naming Everyone's Earth as applicant with the USPTO.

11

While Defendants claim that Plaintiff transferred her rights in the Patents by way of her execution of the assignments that she received from the patent counsel for the transfer of the provisional patent applications, not only does Plaintiff assert that she was already in an implied joint attorney-client relationship with Defendants and the patent counsel (as an unrepresented individual) when they directed her to execute the assignment agreements (representing a clear conflict of interests) related to the purported transfer of the provisional patent applications attached as Defendants' Exhibits C and D, but the assignments of the provisional patents do not represent a transfer of Plaintiff's rights in the Patents. Rather, despite Defendants' assertions, a provisional application is insufficient to transfer the entire chain of applications and patents that follow if the patents disclose any new matter or claim. *Separation Design Group LLP Holdings v. Inogen, Inc.*, 2017 U.S. Dist. LEXIS 234889 (S.D.N.Y. 2017). *Speedfit LLC v. Woodway USA, Inc.*, 2019 U.S. Dist. LEXIS 55187 (E.D.N.Y. 2019).

Here, Defendants fail to expressly assert that the description of the inventions in the two patent applications for the Patents did not incorporate new claims and other material disclosed in the three provisional applications, and that the descriptions in the provisional patent applications were sufficient to allow an individual to make the invention described in the Patents in order to claim that an assignment of the provisional patent is the same as an assignment of the patent itself. However, Plaintiff, the "key inventor" as Defendants refer to her (Def. Mem. p. 8), specifically affirms (Ex. A, Pla. Aff., p. 2) that the Patents go far beyond what was disclosed and described in the provisional applications, which even incorporate different titles of the inventions, mold three provisional applications into two patent applications, and name different inventors and applicants. Accordingly, the purported assignment of the rights associated with the provisional applications did not transfer the ownership of the later-filed non-provisional applications, and thus, ownership

12

of the subject matter contained in the Patents was not transferred from Plaintiff as inventor to Everyone's Earth by the provisional patent assignments attached to Defendants' Memorandum as Exhibits C and D.

### E. Engagement letters and payment of attorneys' fees are not dispositive of the existence of an attorney-client relationship.

While Defendants argue that no attorney-client relationship was formed between Plaintiff and the patent counsel because no engagement letter was provided by the patent counsel to Plaintiff, nor did Plaintiff make any payments for the legal services, these facts are not dispositive of an attorney-client relationship because an implied attorney-client relationship may arise even when no engagement letter is signed, nor attorney fee paid. The fact that the patent counsel "actually performed legal services for Plaintiff is more important than any of these factors[,] because the provision of legal services and advice are the very essence of what an attorney-client relationship is." *Maricultura Del Norte v. Worldbusiness Capital, Inc.*, LEXIS 29953, 2015-1 Trade Cas. (CCH) (S.D.N.Y. 2015). "Viewed objectively, the provision of legal services manifested [the patent counsels'] intent to form that relationship" (*id)*, as occurred in the instant matter.

### 6. Since the attorney-client privilege only shields confidential communications, Defendants waived any claimed privilege by disclosing the communications to Plaintiff and other third parties, in addition to lower-level employees.

### A. Legal standard for sharing confidential attorney communications.

"[T]he privilege applies only to communications between lawyer and client, and only if the communication is held in confidence." *United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989). As a result, the attorney-client privilege only "protects communications between a client and his or her attorney that are intended to be, and in fact were, kept confidential for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). As

13

occurred in the instant action, "[a]ttorney-client privilege generally is waived if the holder of the

privilege discloses or consents to disclosure of privileged communications to a third party." *Id*.

*Fullerton v. Prudential Ins. Co.*, 194 F.R.D. 100, 102 (SDNY 2000).

### B. Defendants waived the attorney-client privilege when they intentionally sent patent counsel communications to Plaintiff.

As Plaintiff argues above, Despite Defendants' argument that Plaintiff had an "implied

role" as Everyone's Earth's "agent" (Def. Opp. Mem. p. 6), instead, all actions taken by Plaintiff

in the furtherance of patenting her inventions were for her own benefit as sole inventor of the

Patents. Plaintiff was not an employee nor a contractor or agent of Defendants. That Everyone's

Earth funded the activities related to the patents in suit does not render Plaintiff Everyone's Earth's

servant or agent "any more than an independent contractor is rendered an agent simply because he

is compensated by the principal for his services." *Protostorm, LLC v. Antonelli*, 834 F. Supp. 2d

141 (E.D.N.Y. 2011). Rather, a simple conclusory allegation to the effect that Plaintiff acted as

Defendants' agent, without more, does not plausibly state an agency relationship.

Moreover, Plaintiff refutes Defendants' claims that she was a corporate representative, de

facto employee, or agent of Everyone's Earth. Def. Mem. p. 7. Though the "functional equivalent"

doctrine extends the attorney-client privilege to communications between a corporation's counsel

and corporate consultants who are de facto employees," (*Export-Import Bank of U.S. v. Asia Pulp

& Paper Co., Ltd.*, 232 F.R.D. 103, LEXIS 28671 (S.D.N.Y. 2005)), "[t]he proponent of the

functional equivalent doctrine bears the burden of establishing that it applies." *Monterey Bay

Military House., LLC v. Ambac Assur. Corp.*, LEXIS 9646, WL 315072 (S.D.N.Y. 2023). Thus,

not only has "[t]he Second Circuit…yet to adopt the "functional equivalent" doctrine, and "some

district courts have expressed skepticism about whether it would do so" (*Id*.), the doctrine is

entirely inapplicable since Defendants have provided no documentary evidence to demonstrate

14

that Plaintiff was under a contractual or fiduciary obligations to Defendants as a *de facto* employee, consultant, agent or otherwise.

### C. Defendants waived the attorney-client privilege when they intentionally sent patent counsels' communications to third parties and lower-level staff.

"Where privileged communications are shared with corporate employees, the question becomes whether the communications were shared with "employees of the corporation who are not in a position to act or rely on the legal advice contained in the communication," in which event the privilege is waived. *In re Allergan PLC Secs. Litig.*, LEXIS 171331, WL 4121300 (S.D.N.Y. 2021). The proponent of the attorney-client privilege may not "assert blanket or categorical claims of privilege; rather, the law requires a showing that the privilege applies to each communication for which it is asserted." The proponent of the privilege "must adduce competent evidence in support of its claims," and "must offer more than just conclusory statements, generalized assertions, and unsworn averments of its counsel" (*McCutcheon v. Colgate-Palmolive Co.*, 2018 WL 5818255, at *3 (S.D.N.Y. 2018).

Here, Defendants fail to sufficiently specify the legal relationship (if any) between Everyone's Earth and the individual recipients of the attorney communications listed in Defendants' privilege log, nor do they clarify which job duties required them to assist the patent counsel in providing the legal advice. *See* Ex. B, listing privilege log entries that lack responsive information. Not only does Defendants' privilege log fail to indicate the individual's role or their relevancy to the patent counsels' legal advice, but there is no sworn statement affirming that these individuals are employees or under a consultant or agency agreement during the relevant time period and that they agreed to assume the roles that Defendants have contended existed.

15

Defendants' counsel, in response to Plaintiff's request, sent an email describing the privileged communication recipients' connection to Everyone's Earth. While Defendants appear to imply that five of the individuals were employees of Everyone's Earth, there is no clear statement that each of the five such individuals were actual W-2 employees of Everyone's Earth during the relevant time period. In addition, one of the referenced individuals served as a lower-level administrative assistant to Kallish, and she was employed not by Everyone's Earth (the party claiming the privilege), but by a company that Kallish formerly owned and had sold to an unrelated third-party purchaser prior to the relevant time period. Two additional privileged communication recipients included independent contractors that are believed to have served in lower-level positions unrelated to obtaining the Patents, and two other individuals are described as having "provided services to the company in exchange for stock options" (Def. counsel email dated July 31, 2023) when no agreement to that effect has been submitted or referenced in a sworn affirmation (and one of the individuals has disagreed with Defendants' characterization of this affiliation with Everyone's Earth).

Based on Kallish's statements, certain of the individual recipients were employed by an unrelated entity and not by Everyone's Earth. Communications with employees of Kallish's other companies, such as Kane Socks Company, are privileged only if Defendants provide evidence that they share "an identical legal interest." *See id.* (citing *Music Sales Corp. v. Morris*, 1999 WL 974025, *7-8 (S.D.N.Y. Oct. 26, 1999) (finding communications privileged where two entities "operate[d], in effect, as a single entity"). Here, Defendants offer no evidence of "sufficient interrelatedness" to permit them "to be treated as one entity for attorney-client privilege purposes." *See Music Sales,* 1999 WL 974025, at *7. In addition, "[t]o determine whether a consultant should be considered the functional equivalent of an employee, courts look to whether the consultant had

16

primary responsibility for a key corporate job, whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the [Patents and their assignment], and whether the consultant is likely to possess information possessed by no one else at the company." *Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005). If Defendants' position is that the individuals who received communications from the patent attorneys are privileged because they were *de facto* Everyone's Earth employees, Plaintiff is entitled to a sworn statement explaining their roles as to the subject matter of the legal advice for each document over which Defendants claim privilege. *Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.,* LEXIS 100080, WL 5231831, at 3 (E.D.N.Y. 2008).

### 7. Any claimed attorney-client privilege in this action is waived as a result of the crime-fraud exception.

#### A. Crime-Fraud Exception applicable law.

There is also an applicable exception to the attorney-client privilege "when legal advice furthers a client's crime or fraud" (*U.S. v. Spinosa*, LEXIS 120141, WL 2644936 (S.D.N.Y. 2021), as is alleged here. "The crime-fraud exception removes the privilege from those attorney-client communications that are 'relate[d] to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997) (alteration in original) (quoting *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994)). The crime-fraud exception also abrogates the work product doctrine. *See In re Richard Roe, Inc.,* 168 F.3d 69, 71-72 (2d Cir. 1999). The purpose of the exception is "to assure that the 'seal of secrecy' between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *Jacobs*, 117 F.3d at 87 (quoting *United States v. Zolin*, 491 U.S. 554, 563 (1989) (internal quotations omitted).

17

The crime or fraud does not have to occur or even be the same conduct sued on for the exception to apply; it need only have been the objective of the communication." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1039; *Antidote Int'l Films, Inc. v. Bloomsbury Publ'g, PLC*, 242 F.R.D. 248, 250-51 (S.D.N.Y. 2007) (applying crime fraud exception to email despite fact fraud suggested in email was not same fraud plaintiff alleged in complaint). Moreover, in determining whether the crime-fraud exception applies, "[t]he pertinent intent is that of the client, not the attorney." *SEC v. Herman*, 00Civ.5575, 2004 WL 964104, at *2 (S.D.N.Y. May 5, 2004). It "applies 'even if the attorney has no inkling that the matter he or she is working on involves any improper conduct." *Id.* at 125. Seeking advice in order to further an ongoing or future criminal activity constitutes an abuse of the attorney-client relationship and, in such cases, the purpose of the privilege is not served by preventing disclosure. *United States v. Saccoccia*, 898 F. Supp. 53, 57 (D.R.I. 1995).

To invoke the exception, the party seeking disclosure must show (1) that there is probable cause to believe that a fraud or crime has been attempted or committed and (2) that the communications in question were in furtherance of the crime or fraud. *See Chevron Corp. v. Salazar*, 275 F.R.D. 437, 451-52 (S.D.N.Y. 2011). With respect to the first element, the probable cause standard is "not an overly demanding" one. *A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*, No. 97 Civ. 4978, 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999) (finding probable cause deals with probabilities—not rigid certainties). "Probable cause exists when a 'prudent person' would have 'a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof.'" *Cendant Corp.*, 246 F.R.D at 405 *quoting In re Grand Jury*, 731 F.2d at 1038. In addition, there must be "a purposeful nexus between

18

the attorney-client communications and the perpetration of the alleged [crime or] fraud[.]" *Id.* at 406.

Courts have found, for example, that such "reasonable basis" existed when the defendant misrepresented or mischaracterized material facts. *Shahinian v. Tankian*, 242 F.R.D. 255, 259 (S.D.N.Y. 2007) (finding reasonable basis where defendants' submissions to IRS contained several omissions of key material facts about defendants' finances); *Specialty Minerals, Inc. v. Pleuss-Stauffer AG*, 98 CIV. 7775, 2004 WL 42280, at *10-11 (S.D.N.Y. 2004) (finding reasonable basis based on defendants' failures to disclose prior art in patent application). Nor does "an innocent explanation . . . consistent with the facts alleged . . . negate probable cause." *A.I.A. Holdings, S.A.*, 1999 WL 61442, at *5; *see also United States v. McDonald*, 01-CR-1168, 2002 WL 31956106, at *5 (E.D.N.Y. 2002) (holding notwithstanding defendants' explanation otherwise, government need only establish it more likely than not that defendants engaged in a fraudulent scheme and that attorney communications were in furtherance of that fraud).

### B. Probable cause exists.

Here, there is probable cause that Kallish knowingly misrepresented his inventorship of the Patents to the USPTO, signing a declaration, under penalty of perjury, that he was an inventor of the Patents when he contributed nothing to the development of the inventions, as required under 355 U.S.C. § 116. Since a determination of inventorship is a highly complex "question of law" (*Sewall v. Walters*, 21 F. 3d 411, 415 (Fed. Cir. 1994)), Plaintiff relied on the professional judgment of the patent counsel, and she has a right to explore in this litigation what documentary evidence, if any, caused them to name Kallish as a co-inventor of the Patents.

The evidence that Kallish committed fraud and inequitable conduct on the USPTO, and utilized the legal services of the patent attorneys in the commission thereof, is overwhelming and

19

certainly far more than necessary to meet the relatively low probable cause standard. Here, the patent counsel ignored several red flags about Kallish's fraudulent conduct related to his eligibility as an inventor of the Patents, including:

1. Evidence of the patent counsels' involvement in Kallish's fraudulent schemes to claim inventorship of Plaintiff's patents (in order to take control of them) began with Plaintiff's very first meeting with Kallish[6] and the patent counsel. BATES 7-10. Even though Plaintiff was already selling the ultimately-patented formula to Kallish's company, and Plaintiff disclosed the invention to Kallish and the patent counsel by email prior to meeting them in New York (BATES 26474-26477), the patent counsel filed a patent application with the USPTO designating Kallish as co-inventor of the invention—despite their personal knowledge that the invention was fully developed before the patent counsel and Kallish met Plaintiff.

2. Also illuminating with respect to a probable cause finding of fraud in connection with the '806 patent (one of the two patents in suit) were the patent counsels' actions in initially designating Plaintiff as the sole inventor and applicant on the patent application, but with no justification, approximately three months later filing an amendment of the patent application with the USPTO adding Kallish as a co-inventor of the patent and designating Everyone's Earth as applicant (though Plaintiff did not execute the assignment of the '806 patent until three months after the false application was filed). Tellingly, none of the claims, design or technical specifications underlying the '806 patent were amended to justify and explain Kallish's inclusion on the amended patent as a joint inventor.

3. In an email dated November 17, 2016, the patent counsels' legal services are associated with the fraud on the USPTO, with the patent counsel instructing Kallish to have the Power of

---

[6] Plaintiff and Kallish may have both been attendees of a meeting in 2000 held by Plaintiff's former employer (an unrelated party in this matter), where they had, at most, a cursory 5-minute conversation.

Attorney in favor of the patent counsel and other documents to be filed with the USPTO be executed by Plaintiff as "part of the process of changing the applicant from Nicole to Everyone's Earth Inc. and having your name entered as the second inventor on the application," despite that the patent counsel held no documentation demonstrating Kallish's supposed contributions to the patent in collaboration with Plaintiff. Plaintiff and Kallish did not reside or work in temporal proximity, and Plaintiff's telephone records show that, for the relevant period, between 2014 and 2017 (BATES 22503-23867), she engaged in minimal telephone conversations with Kallish lasting on average less than 6 minutes—insufficient time to develop together the complex chemistry and other technical features associated with the Patents.

4. Emails evidence that the patent counsel advised Kallish on at least three separate occasions on the requirements of inventorship, to which Plaintiff was not privy, that should have educated him about the qualifications for inventorship, including contemporaneous collaboration and a meaningful contribution from each inventor. BATES 3905-3908, 27930, 27902.

5. On October 10, 2017, Kallish evidenced his intention to unjustifiably remove Plaintiff from the '946 patent at issue in this action (though she was the sole inventor), sending an email to the patent counsel (with a copy to Plaintiff) that stated "for our own reasons I would like to be the only name on the patent as they will be assigned to the company is that OK?" The patent counsel responded by email on the same date, stating "Tom, we should have a call to discuss what each person's contribution was. If the inventorship is not accurate, it can compromise the validity of the patent. I suspect we may have to name Nicole, as I believe she likely picked the thickening agent and proportion of the dyes. What is a good time for a call? I am around all week."

6. Kallish evidenced his intention to commit fraud with respect to patent filings with the USPTO, when his CEO directed the patent counsel to remove Plaintiff as inventor of a patent

21

which she solely developed without any input from Kallish. Here, on May 31, 2019, the patent counsel sent an email to Kallish querying him on the inventors to be designated on a patent application for a sock technology, which followed the provisional application on which Plaintiff was the sole named inventor. BATES 27874. Chris Leyes, CEO of Kane Socks Company, replied, "just spoke to Tom, please list both Tom & Nicole as inventors on this application." BATES 27874. However, 23 minutes later, Mr. Leyes sent a follow up email stating that "Tom just called me back – he just wants himself listed as the inventor – could you confirm receipt / understanding." BATES 27873-27874. The patent counsel responded that "I confirm that we understand that Tom is the only inventor for this application" (BATES 27874), promptly amending the inventorship on the application to remove Plaintiff and add Kallish. However, there lacked any evidence to suggest that Kallish had participated in the development of the invention during the course of the 18 months that Plaintiff worked with the patent counsel on the development of the patent, having spoken solely to Plaintiff about the technical aspects of the patent.

7. Despite both Plaintiff and Kallish being designated as co-inventors of the Patents, only Plaintiff attended the two examiner interviews with the patent counsel. Though Kallish is not referenced as an attendee in the minutes of the examiner meetings that were provided by the USPTO, Kallish stated in response to Plaintiff's Request for Admissions that he participated in the USPTO examiner meetings, which is provably false.

8. Kallish stated numerous times to Plaintiff that the one patent attorney who worked continuously with Plaintiff on patenting her inventions, from her initial meeting with Kallish through the issuance of the Patents, held an official position with Everyone's Earth as either a director, officer or stockholder. While Kallish has refused to produce any documentary evidence to respond to Plaintiff's demands in order for Plaintiff to establish the legal relationship between

22

Everyone's Earth and the patent attorneys, Plaintiff questions the meaning of Kallish's statement to such patent attorney in an email dated September 12, 2020 at 7:32 AM, that "I haven't forgotten you" following his notification that one of the Patents had issued. BATES 26543.

Accordingly, the patent attorneys' legal services in filing false documents with the USPTO on behalf of Defendants directly furthered Kallish's fraudulent actions, and as a result, any attorney-client privilege of communications between the patent counsel and others related to the Patents should be waived.

**8. Defendants waived privilege for failure to adequately describe the communications.**

Defendants waived any privilege as to the communications referenced in Defendants' privilege log, as identified in Ex. B attached hereto, by failing to adequately describe the communications on its initial privilege log, nor on its updated privilege log following the Court's order to amend the log. Moreover, Defendants continue to withhold documents involving third parties without satisfying their burden of demonstrating that the communications were privileged, and as a result, any purported privilege is waived. Alternatively, Plaintiff requests that the Court order Defendants to produce a declaration or other sworn evidence with sufficient detail to allow Plaintiff and the Court to assess Defendants' assertions of privilege.

**CONCLUSION**

Accordingly, Plaintiff respectfully requests that the Court deny Defendants' motion for the application of the attorney-client privilege to the services performed by, and communications with, the attorneys who prosecuted the Plaintiff's patents, including information about the inventorship of the Patents and their purported assignment to Everyone's Earth. In addition, Plaintiff respectfully requests leave to subpoena the patent counsel for a deposition, and a declaratory

23

judgment that the witnesses in this matter be prohibited from asserting the attorney-client privilege

and/or work-product doctrine in connection with the foregoing patent-related matters.

DATED:      White Plains, New York
            August 1, 2023

Respectfully submitted,

/s/ Claudia Pollak
75 S. Broadway 4th Fl.
White Plains, NY 10601
914-529-9111
claudia@claudiapollaklaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 1, 2023, a copy of the foregoing Plaintiff's Memorandum of Law

in Opposition to Defendants' Thomas Kallish and Everyone's Earth, Inc. Memorandum of Law,

was served on the following parties by email:


    Leslie Cahill, Esq.
    Joseph Martini, Esq.
    SPEARS MANNING & MARTINI
    2425 Post Road, Suite 203
    Southport, CT 06890
    lcahill@spearsmanning.com
    jmartini@spearsmanning.com


        By: __/s/ Claudia Pollak___
           Claudia Pollak, Esq.
           75 S. Broadway
           White Plains, NY 10601
           Attorney for Plaintiff
           914-529-9111